UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

PAUL LA SCHIAZZA

No. 22 CR 520

Judge Robert W. Gettleman

**GOVERNMENT'S CONSOLIDATED RESPONSE TO
DEFENDANT'S PRETRIAL MOTIONS**

MORRIS PASQUAL
Acting United States Attorney

By:     /s/ *Paul Mower*
        AMARJEET S. BHACHU
        JULIA K. SCHWARTZ
        TIMOTHY J. CHAPMAN
        PAUL MOWER
        SUSHMA RAJU
        Assistant United States Attorneys
        219 South Dearborn Street
        Fifth Floor
        Chicago, Illinois 60604
        (312) 353-5300

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

ARGUMENT ...................................................................................................... 5

    I.     Defendant's Motion To Dismiss Counts One and Two Should Be
          Denied. .......................................................................................... 5

        A.     Applicable Law ...................................................................... 5

        B.     Counts One and Two Track the Statutory Language and Place
            Defendant on Fair Notice of the Charges. ................................ 7

        C.     The Indictment Sufficiently Alleges that Defendant Intended to
            Engage in a *Quid Pro Quo*. .................................................. 10

        D.     Defendant's Definition of "*Quid Pro Quo*" Is Incorrect. ......................... 16

        E.     Defendant's Definition of "Corruptly" Is Incorrect. ............................. 18

    II.    Defendant's Motion for Production of Grand Jury Minutes Should Be
          Denied. ........................................................................................ 27

        A.     Applicable Law .................................................................... 27

        B.     Defendant Cannot Show Particularized Need for Grand Jury
            Materials Based on the Government's Instructions Relating to
            Bribery. ............................................................................ 28

        C.     Defendant Cannot Show Particularized Need for Grand Jury
            Materials Based on the Government's Instructions Relating to the
            Term "Corruptly." ............................................................... 30

CONCLUSION .................................................................................................. 34

# TABLE OF AUTHORITIES

## CASES

*Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005) ...........................................20, 26

*Bank of Nova Scotia v. United States,* 487 U.S. 250 (1988) ....................................................31

*Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211 (1979)...........................................28

*Hamling v. United States*, 418 U.S. 87 (1974) ......................................................................... 5

*Hernly v. United States*, 832 F.2d 980 (7th Cir.1987)..............................................................28

*Lockhart v. United States*, 577 U.S. 347 (2016) ......................................................................25

*Matter of Grand Jury Proc., Special Sept., 1986*, 942 F.2d 1195 (7th Cir. 1991)............27, 28

*McDonnell v. United States*, 579 U.S. 550 (2016) ..............................................................15, 17

*New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54 (1980)....................................................17

*Ocasio v. United States*, 578 U.S. 282 (2016)..........................................................................25

*Snyder v. United States,* 144 S. Ct. 1947 (2024) .............................................................passim

*United States v. Abreu*, 106 F.4th 1 (1st Cir. 2024) ................................................................25

*United States v. Aguilar*, 515 U.S. 593 (1995) ........................................................................26

*United States v. Anderson*, 280 F.3d 1121 (7th Cir. 2002) ...................................................... 5

*United States v. Anderson*, 61 F.3d 1290 (7th Cir. 1995) ........................................................31

*United States v. Avenatti*, 432 F. Supp. 3d 354 (S.D.N.Y. 2020) ...........................................17

*United States v. Bates*, 96 F.3d 964 (7th Cir. 1996)................................................................ 6

*United States v. Benjamin*, 95 F.4th 60 (2d Cir. 2024)............................................................16

*United States v. Blagojevich*, 894 F.3d 729 (7th Cir. 2015).............................................16, 22

*United States v. Brooks*, 125 F.3d 484, 498 (7th Cir. 1997).....................................................31

*United States v. Bruno*, 661 F.3d 733 (2d Cir. 2011) ........................................................12, 14

*United States v. Burke*, No. 19 CR 322, 2022 WL 1970189 (N.D. Ill. June 6, 2022)..............16

*United States v. Buske*, No. 09-CR-65, 2010 WL 3023364 (E.D. Wis. July 29, 2010) ...........29

*United States v. Canino*, 949 F.2d 928 (7th Cir. 1991)...........................................................28

*United States v. Chaoqun*, No. 23-1262, 2024 WL 3355141 (7th Cir. July 10, 2024) ...........25

*United States v. Chavez*, 895 F.2d 1418 (9th Cir. 1990) ......................................................31

*United States v. Cox*, 536 F.3d 723 (7th Cir. 2008)................................................................ 6

*United States v. Dial*, 757 F.2d 163 (7th Cir. 1985)........................................................14, 33

*United States v. Espy*, 23 F. Supp. 2d 1 (D.D.C. 1998) ..........................................................32

*United States v. Farrell*, 921 F.3d 116 (4th Cir. 2019) ..........................................................21

*United States v. Firtash*, 392 F. Supp. 3d 872 (N.D. Ill. 2019)................................................ 6

*United States v. Fischer*, 64 F.4th 329 (D.C. Cir. 2023) ........................................................21

*United States v. Garcia-Geronimo*, 663 F.3d 738 (7th Cir. 1981).........................................11

*United States v. Hawkins*, 777 F.3d 880 (7th Cir. 2015) .................................................19, 30

*United States v. Jennings*, 160 F.3d 1006 (4th Cir. 1998) ....................................................16

*United States v. Kelerchian,* 937 F.3d 895 (7th Cir. 2019) ..................................................... 7

*United States v. Kimbrew*, 944 F.3d 810 (9th Cir. 2019).................................................15, 16

*United States v. Lisinski*, 728 F.2d 887 (7th Cir. 1984).........................................................28

*United States v. Lonich*, 23 F.4th 881 (9th Cir. 2022) ..........................................................21

*United States v. Mann*, 701 F.3d 274 (8th Cir. 2012) ..........................................................21

*United States v. Matthews*, 505 F.3d 698 (7th Cir. 2007)......................................................20

*United States v. McElroy*, 910 F.2d 1016 (2d Cir. 1990)........................................................21

*United States v. Miller*, No. 08 CR 629, 2010 WL 4962808 (N.D. Ill. Dec. 1, 2010)..............31

*United States v. Mitziga,* No. 23 CR 242 (N.D. Ill.) ..............................................................26

*United States v. Moore*, 563 F.3d 585 (7th Cir. 2009) .......................................................... 6

*United States v. Mullins*, 800 F.3d 866 (7th Cir. 2015) ...................................................19, 30

*United States v. Ng Lap Seng*, 934 F.3d 110 (2d Cir. 2019) ..................................................21

*United States v. Proctor & Gamble*, 356 U.S. 677 (1958) ......................................................28

*United States v. Ring*, 706 F.3d 460 (D.C. Cir. 2013) ...........................................................17

*United States v. Robertson*, 103 F.4th 1 (D.C. Cir. 2023) ........................................20

*United States v. Rosen*, 716 F.3d 691 (2d Cir. 2013)..............................................14

*United States v. Sells Engineering, Inc.*, 463 U.S. 418 (1983) ...............................27

*United States v. Skelos*, 988 F.3d 645 (2d Cir. 2021) ...........................................10

*United States v. Smith*, 223 F.3d 554 (7th Cir. 2000)............................................11

*United States v. Suhl*, 885 F.3d 1106 (8th Cir. 2018) ...........................................16

*United States v. Sun-Diamond Growers of California*, 526 U.S. 398 (1999)...................19, 32

*United States v. Thomas*, 150 F.3d 743 (7th Cir. 1998) .......................................... 6

*United States v. Urciuoli*, 613 F.3d 11 (1st Cir. 2010) ...........................................15

*United States v. Vanderhorst*, 2 F. Supp. 3d 792 (D.S.C. 2014) .............................32

*United States v. Vaughn*, 722 F.3d 918 (7th Cir. 2013)...............................5, 6, 9, 32

*United States v. Volpendesto*, 746 F.3d 273 (7th Cir. 2014) ..................................20

*United States v. Westmoreland*, 240 F.3d 618 (7th Cir. 2001)................................. 6

*United States v. White*, 610 F.3d 956 (7th Cir. 2010) ...........................................5, 6

*United States v. Woodward*, 905 F.3d 40 (1st Cir. 2018) .......................................15

*United States v. Yashar*, 166 F.3d 873 (7th Cir. 1999) ........................................... 6

## STATUTES

18 U.S.C. § 201 ..........................................................................................23

18 U.S.C. § 226 ..........................................................................................23

18 U.S.C. § 245(b) ......................................................................................23

18 U.S.C. § 1001(a) ....................................................................................23

18 U.S.C. § 1035(a) ....................................................................................23

18 U.S.C. § 1517 ........................................................................................23

26 U.S.C. § 7206(1) ....................................................................................23

42 U.S.C. 1320a-7b(a) .................................................................................23

## RULES

Fed. R. Crim. P. 6 ...................................................................................................27

Fed. R. Crim. P. 7 ..................................................................................................... 5

Fed. R. Crim. P. 12 ................................................................................................... 6

Local Crim. R. 6.1 ...................................................................................................30

## OTHER AUTHORITIES

7th Cir. Pattern Crim. Jury Instr. (2023) ......................................................... 7, 19

*Stephen M. Calk, Aka Sealed Defendant 1, Petitioner, v. United States of America*, Resp't Br., 2024 WL 3550159 (Jul. 24, 2024) ................................................................23

## **INTRODUCTION**

The UNITED STATES OF AMERICA, by its attorney, MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, respectfully submits the following response in opposition to defendant Paul La Schiazza's pretrial motions. R. 64, 65, 66.

Between approximately February 2017 and January 2018, defendant conspired with then Speaker of the Illinois House of Representatives Michael Madigan, Madigan's close confidant Michael McClain, and Individuals ATT-1, ATT-2, and ATT-3 to corruptly confer benefits on a Madigan associate in order to influence and reward Madigan for supporting AT&T's carrier of last resort ("COLR") legislation.

Defendant now claims that the Supreme Court's narrow decision in *Snyder v. United States,* 144 S. Ct. 1947 (2024), alters the entire fabric of the indictment and trial in this case. Neither *Snyder,* nor basic principles of statutory construction, support defendant's claim. While *Snyder* held that 18 U.S.C. § 666 criminalizes bribes but not gratuities, the indictment in this case amply alleges that defendant engaged in bribery. ██████████████████████████████ ████ █████ █████████████████████████████████████████████████ ████████████████████ ██████ ██████████████████████ ████ There is no basis to dismiss the indictment, and no basis to require disclosure of any secret grand jury material to the defendant.

Nor is there basis to dismiss the indictment because of defendant's newly proposed definition of "corruptly," which purports to require the government to prove

1

that defendant knew his conduct was illegal. Neither *Snyder* nor any other case inflates the *mens rea* for § 666 to this height. Rather, as one court in this district recently agreed, the definition proposed by the government—which requires that defendant understood his conduct to be wrongful or unlawful—is appropriate and supported by case law. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

## <u>BACKGROUND</u>

### *Factual Background*

As alleged in the indictment, in the winter and early spring of 2017, AT&T Illinois President Paul La Schiazza and his Legislative Affairs team, including Individuals ATT-1, ATT-2, and ATT-3, lobbied the Illinois General Assembly to enact the company's longstanding top policy initiative: eliminating AT&T's costly responsibility to provide landline telephone service to any Illinois resident who requested it, commonly referred to as AT&T's carrier of last resort ("COLR") obligation. R. 1, Count 1, ¶ 1(m)-(n). Due to the high value that AT&T placed on COLR relief, it sought and failed to secure COLR reform during multiple prior legislative cycles. *Id.* ¶ 1(m).

As the evidence at trial will prove, those efforts all failed, in part due to a lack of legislative backing from Illinois House Speaker Michael Madigan. "King Madigan," as defendant described him in documents that will be introduced at trial, ruled the Illinois House "with an iron fist," and "no bill [could] get through the legislature and to the Governor without the tacit approval of the all-powerful" Speaker. *See also* R. 1,

Count 1, ¶ 1(h). As a result, AT&T viewed Madigan's support of the renewed COLR effort in 2017 as critical.

As a result, at McClain's request, defendant and his coconspirators arranged for AT&T to pay Individual FR-1, a former state representative and Madigan political ally, approximately $22,500 for supposed consulting services. R. 1, Count 1, ¶¶ 3, 4, 17(a), 17(m). McClain first asked AT&T to hire Individual FR-1 on or about February 14, 2017. *Id.* ¶ 17(a). Just two days later, McClain informed an AT&T representative that he was working on AT&T's major legislation as a "Special Project" for Madigan. *Id.* ¶ 17(b). On March 28, 2017, McClain again asked for a "small contract" for Individual FR-1 on Madigan's behalf. *Id.* ¶ 17(c). Defendant understood this to be a "GO order" for the company to hire Individual FR-1, and after that AT&T representatives pushed to hire Individual FR-1 and to ensure the company would "get credit" for the hire from Madigan. *Id.* ¶¶ 17(d)-(g).

AT&T employees discussed that they would need to confirm with McClain their plan to hire Individual FR-1 through an intermediary and the amount of the payments. R. 1, Count 1, ¶¶ 9, 10, 17(e)-(j), (n). Between April 5 and April 20, 2017, before any AT&T representative had contacted Individual FR-1 about the arrangement, the company amended its contract with an existing lobbyist (Intermediary 4) so that AT&T could make indirect payments to Individual FR-1 through Intermediary 4. *Id.* ¶¶ 17(k)-(l). Before confirming the arrangement with Individual FR-1, defendant and his co-conspirators vetted the contract amount

through McClain and sought assurance that AT&T would receive "credit" from Madigan for making the payments to Individual FR-1. *Id.* ¶¶ 17(e)-(j).

Six days after the contract amendment, AT&T representatives first met with Individual FR-1 to discuss paying Individual FR-1 $2,500 per month. *Id.* ¶ 17(m). Individual FR-1 rejected that amount and contacted McClain. *Id.* ¶ 17(n). After that, on April 28, 2017, McClain informed AT&T representatives that $2,500 per month was sufficient. *Id.* ¶ 17(n). AT&T then paid Individual FR-1 $2,500 per month for the last nine months of 2017, totaling $22,500. *Id.* ¶ 17(s).

In reality, the reasons given for paying Individual FR-1 were pretextual, and Individual FR-1 did no work in return for the payments. R. 1, Count 1, ¶¶ 8, 11, 12. The purpose of those payments was to bribe Madigan with regard to AT&T's COLR legislation. *Id.* ¶ 3. In fact, defendant and his coconspirators concealed the true nature of the payments by using Intermediary 4 as a pass-through entity. *Id.* ¶ 7. In a further effort to conceal the arrangement, defendant and the coconspirators went out of their way to omit Individual FR-1's name in internal records. *Id.* ¶¶ 7, 13, 16, 17(k).

Less than a month after McClain confirmed that $2,500 per month was sufficient, Madigan requested a complete roll call of AT&T's COLR legislation. *Id.* ¶ 17(o). He subsequently voted in favor of the COLR legislation on two occasions and further voted to override the Governor's veto of the legislation. *Id.* ¶¶ 17(o)-(r).

### *The Indictment*

On October 12, 2022, the grand jury returned a five-count indictment against defendant charging him with conspiring to commit an offense against the United

States, federal program bribery, and use of interstate facilities in aid of racketeering activity. R. 1.

***The Pretrial Motions***

Defendant seeks through his pretrial motions: (1) to dismiss Counts One and Two of the indictment (R. 65, 66); and (2) to compel the production of grand jury materials (R. 64).

## ARGUMENT

**I.    Defendant's Motion To Dismiss Counts One and Two Should Be Denied.**

### A.    Applicable Law

An indictment must "be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment complies with Rule 7 and the Constitution if it (1) states the elements of the crimes charged; (2) adequately informs a defendant of the nature of the charges brought against him; and (3) enables the defendant to assert the judgment as a bar to future prosecutions for the same offense. *Hamling v. United States*, 418 U.S. 87, 117 (1974); *United States v. Vaughn*, 722 F.3d 918, 925 (7th Cir. 2013); *United States v. White*, 610 F.3d 956, 958-59 (7th Cir. 2010); *United States v. Anderson*, 280 F.3d 1121, 1124 (7th Cir. 2002). To successfully challenge the sufficiency of an indictment based on the failure to allege a required element, a defendant must establish both that an essential element was omitted and that he suffered prejudice as a result. *Vaughn*, 722 F.3d at 925.

"Facial sufficiency is not a high hurdle"; there is no need for an indictment to "exhaustively describe the facts surrounding a crime's commission." *United States v. Bates*, 96 F.3d 964, 970 (7th Cir. 1996), *aff'd*, 522 U.S. 23 (1997); *United States v. Westmoreland*, 240 F.3d 618, 633 (7th Cir. 2001) (an indictment need not spell out each element so long as each element is present in context). An indictment that tracks the words of a statute to state the elements of the crime generally is acceptable, so long as the indictment states sufficient facts to place a defendant on notice of the specific conduct at issue. *Vaughn*, 722 F.3d at 925.

When considering a motion to dismiss under Rule 12(b), a court assumes all facts in the indictment to be true and "view[s] all facts in the light most favorable to the government." *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999); *see also United States v. Moore*, 563 F.3d 585, 586 (7th Cir. 2009). The court evaluates the allegations "on a practical basis and in their entirety, rather than in a hypertechnical manner." *United States v. Cox*, 536 F.3d 723, 726 (7th Cir. 2008) (quotation omitted). A motion to dismiss an indictment is not a summary-judgment motion and should not be used to "test[] the strength or weakness of the government's case, or the sufficiency of the government's evidence." *Moore*, 563 F.3d at 586 (citation omitted); *see also White*, 610 F.3d at 959 (courts "do not consider whether any of the [indictment's] charges have been established by evidence, or whether the Government can ultimately prove its case"); *United States v. Thomas*, 150 F.3d 743, 747 (7th Cir. 1998) (Easterbrook, J., concurring) ("Summary judgment does not exist in criminal cases.") (citation omitted); *United States v. Firtash*, 392 F. Supp. 3d 872, 885 (N.D. Ill. 2019)

(Pallmeyer, C.J.) ("To the extent Defendants dispute the government's ability to prove their case, that is a matter for trial, not a basis for dismissal.").

**B.    Counts One and Two Track the Statutory Language and Place Defendant on Fair Notice of the Charges.**

With regard to the Count One conspiracy, the indictment must allege, and the government must prove at trial, that (1) a conspiracy existed; (2) the defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy; and (3) one of the conspirators committed an overt act in an effort to advance a goal of the conspiracy. 7th Cir. Pattern Crim. Jury Instr. § 5.08(A) (2023). The government will also be required to prove that at least two people agreed to commit a crime (*id.* § 5.09), and that defendants were "aware of the illegal goal[s] of the conspiracy and knowingly joined the conspiracy." *Id.* § 5.10. The government need only prove at trial that "each conspirator . . . specifically intended that *some conspirator* commit each element of the substantive offense." *United States v. Kelerchian,* 937 F.3d 895, 914-15 (7th Cir. 2019) (quoting *Ocasio v. United States*, 578 U.S. 282, 292 (2016)).

As pertinent here, 18 U.S.C. § 666(a)(2) makes it a crime for an individual to corruptly give, offer, or agree to give anything of value to any person, intending to influence or reward an agent of state government "in connection with any business, transaction, or series of transactions" of such government involving anything of value over $5,000. In addition, § 666(a)(1)(B) makes it a crime for an agent of state government to corruptly solicit or demand, for the benefit of any person, or to accept or agree to accept, anything of value, "intending to be influenced or rewarded in

connection with any business, transaction, or series of transactions" of that government involving anything of value over $5,000.

In *Snyder*, the Supreme Court held that while Section 666 *did* in fact cover gratuities when it was originally passed in 1984, it was amended in 1986 to completely eliminate its application to gratuities, thus reversing the Seventh Circuit's longstanding holding to the contrary. *Snyder v. United States*, 144 S. Ct. 1947, 1951, 1953-54 (2024).[1] But *Snyder* strongly reaffirmed that the statute applies to bribery, which the indictment in this case properly charges. The Court held that the word "rewarded" in Section 666 does not proscribe gratuities, but instead is a "belt and suspenders" to reach bribes where, for instance, a corrupt "agreement was made before the act but the payment was made after the act," or the official defendant "took a bribe before the official act but asserts as a defense that he would have taken the same act anyway and therefore was not 'influenced' by the payment." *Id*. at 1959.

All *Snyder* means for this case is that the government cannot proceed on a gratuity theory at trial, and it does not intend to do so. *Snyder* did not alter the language of § 666, and the § 666 counts in the indictment track the statutory language. Specifically, Count Two charges defendant with corruptly offering and agreeing to give a thing of value, namely, payments of $2,500 a month, for the benefit of Madigan and Individual FR-1. R. 1, Count 2. The Count One conspiracy is similarly premised on an agreement to violate § 666 and tracks the language of the statute.

---

[1] Reversing and remanding *United States v. Snyder,* 71 F.4th 555, 579-80 (7th Cir. 2023).

R. 1, Count 1. Indeed, the § 666 counts are charged in conjunction with Travel Act counts concerning the same conduct, and those companion charges describe defendant's conduct as involving bribery, not gratuities. This alone is sufficient basis to deny defendant's motion to dismiss.

The indictment also contains detailed factual allegations that put defendant on notice of the specific nature of the charges. It details the scheme from its start in or around February 2017 to its conclusion in or around January 2018, highlighting how McClain approached AT&T asking for a contract for Individual FR-1 in February 2017 and the steps that defendant and his coconspirators took to hire Individual FR-1 and hide that they had done so, both internally at the company and externally. R. 1, Count 1, ¶¶ 5-7, 17(a)-(n). It further explains how Individual FR-1 had little input on the arrangement until it was nearly final, while McClain, in contrast, weighed in to bless the specifics of the arrangement. *Id.* ¶¶ 8-10, 17(m), 17(n). Moreover, the detailed allegations in the indictment make clear that the conspirators agreed to give a thing of value to Madigan *before* he had taken official action on COLR legislation in order to influence his future action; this was not a "thank you" that was first decided upon after the vote on the legislation was taken.

Given the detailed allegations in the indictment, the § 666-related counts amply satisfy all legal and constitutional requirements after *Snyder*. The counts are more than sufficient to notify defendant of the charged offenses, protect him from double jeopardy, and enable him to prepare a defense; thus, they are facially valid. *See, e.g., Vaughn*, 722 F.3d at 927 (indictment is adequate if it sets forth the elements

of the offense, identifies the date and time of the alleged criminal conduct, and provides citations to applicable statutes); *United States v. Skelos*, 988 F.3d 645, 659 (2d Cir. 2021) ("The language in an indictment is not required to be as precise as the attendant jury charge, nor is it required to delineate how the government will prove the elements set forth in the indictment.").

### C.  The Indictment Sufficiently Alleges that Defendant Intended to Engage in a *Quid Pro Quo*.

The government agrees that under *Snyder*, the government must prove for a substantive offense under § 666 the intent offer or receive a thing of value in exchange for official action. The majority opinion in *Snyder* does not use the phrase "*quid pro quo*"; instead it specifies that "[a] state or local official can violate § 666 when he accepts an up-front payment for a future official act or agrees to a future reward for a future official act." 144 S. Ct. at 1959. Thus, § 666 prohibits bribes offered or solicited in *exchange* for an official act, which "corrupt the official act," but does not prohibit gratuities, which are paid or offered "to an official *after* an official act as a token of appreciation." *Id*. at 1951-52 (emphasis in original).

Defendant asserts that the government failed to allege that defendant "intended or agreed to hire [Individual FR-1] in exchange for Madigan's support for COLR or any other legislation." R. 66 at 13. That is plainly incorrect. As discussed above, here the § 666 charges against defendant expressly allege that he corruptly offered a thing of value intending to "influence and reward" Madigan "in connection with" the "COLR legislation." R. 1, Count 1 ¶¶ 2(a)-(b), Count 2. The indictment

10

further sufficiently alleges that the benefits were given to influence Madigan's official

action on COLR:

> [F]or the purpose of influencing and rewarding Madigan in connection with his official duties as Speaker of the House of Representatives, and to assist AT&T Illinois with respect to the passage of COLR legislation, the conspirators arranged for Individual FR-1 to indirectly receive payments made at the direction of AT&T Illinois totaling $22,500 . . . .

*Id.* ¶ 3.

Per *Snyder*, the words "influence" and "reward" are synonymous with bribery. Indeed, the Court noted that the word "influenced" *alone* was probably sufficient to "cover[] the waterfront of bribes," but that addition of the word "rewarded" eliminated all "potential ambiguities, gaps, or loopholes." 144 S. Ct. at 1959. Thus, use of these words in tandem covers *all* species of bribery. *Id.* Here, Counts One and Two faithfully use these precise words to describe defendant's conduct. In doing so, these charges properly allege that defendant engaged in bribery, thus eliminating any "ambiguities," "gaps," or "loopholes," and giving defendant fair notice. No other special words or incantation, such as the ambiguous Latin phrase "*quid pro quo*" (which does not appear in this or any other commonly used federal bribery statute), need be referenced. *United States v. Smith*, 223 F.3d 554, 572 (7th Cir. 2000) ("In determining whether an essential element of the crime has been omitted from the indictment, courts will not insist that any particular word or phrase be used.") (quoting *United States v. Garcia-Geronimo*, 663 F.3d 738, 742 (7th Cir. 1981)).

11

But the indictment does not stop there. As detailed above, accepting the indictment's allegations as true, the conspirators' communications, their efforts at concealment, and the timing of the hiring of Individual FR-1 demonstrate that defendant hired Individual FR-1 for Madigan in exchange for Madigan's support on AT&T's COLR legislation.

The timing alone is compelling evidence that the payments to Individual FR-1 were agreed to in exchange for COLR relief. *See United States v. Bruno*, 661 F.3d 733, 744 (2d Cir. 2011) (timing of benefits in relation to official action can support a finding of *quid pro quo*). Early in the 2017 legislative session, on February 14, 2017, McClain wrote Individual ATT-1 on Madigan's behalf asking for a "small contract" for Individual FR-1. R. 1, Count 1, ¶ 17(a). Just two days later, but before AT&T had responded to Madigan's request, McClain told defendant that Madigan had assigned McClain to work on AT&T's COLR legislation as a "Special Project." *Id.* ¶ 17(b). Defendant himself acknowledged this was a major development, as the COLR bill was AT&T's biggest legislative priority in 2017, and the company had failed to enact the legislation in prior legislative sessions. *Id.* ¶ 1(m). On March 28, 2017, McClain again asked for a "small contract" for Individual FR-1 on Madigan's behalf. *Id.* ¶ 17(c). Defendant understood this to be a "GO order" for the company to hire Individual FR-1. *Id.* ¶ 17(d). Afterward, McClain continued to work with AT&T's employees on the COLR bill throughout the spring of 2017, not as a lobbyist, but as Madigan's agent, all while pushing the company to pay Individual FR-1. *Id.* ¶ 14.

Defendant knew the request was a bribe. Before agreeing to pay Individual FR-1 through an intermediary, he and his coconspirators engaged in extensive internal discussions about ensuring that AT&T would receive "credit" from Madigan in exchange for agreeing to his request. On March 31, 2017, for example, defendant stated that he had no objection to paying Individual FR-1 through an intermediary "as long as you are sure we will get credit and the box checked" in return. R. 1, Count 1, ¶ 17(e). The same day, Individual ATT-3 asked Individuals ATT-1 and ATT-2, "[A]re we 100% certain that we will get credit for being responsive?" *Id.* ¶ 17(f). Individual ATT-3 later stated that the "remaining question is if we would get credit from *the powers that be.*" *Id.* ¶ 17(g) (emphasis added). Individual ATT-2 responded, "I would hope that as long as we explain the approach to McClain and [Individual FR-1] gets the money then the ultimate objective is reached." *Id.* ¶ 17(h). Individual ATT-3 replied, "I don't think [defendant] wants this based on 'hope.' We need to confirm prior to executing this strategy." *Id.* ¶ 17(i). Just two days later, Individual ATT-1 texted McClain and said that he wanted to discuss a "consulting issue." *Id.* ¶ 17(j). The repeated use of the word "credit" itself contemplates an exchange of this-for-that, with a focus on ensuring AT&T, which was poised to finally make headway on its most significant legislative priority, received something of value from Madigan in return for the payments.

The arrangement with Individual FR-1 did not follow the normal course for consultant hiring, which further demonstrates an intent to engage in a *quid pro quo*. Defendant internally approved payments intended for Individual FR-1 on or about

April 20, 2017, nearly a week before anyone at AT&T even spoke to Individual FR-1 about a consulting contract or the proposed payments. R. 1, Count 1, ¶¶ 17(l)-(m). And Individual FR-1 was paid for the entire month of April even though he did not accept AT&T's offer until April 28, 2017. *Id.* ¶ 17(n). *See United States v. Rosen*, 716 F.3d 691, 703 (2d Cir. 2013) (*quid pro quo* existed where payments far exceeded token gift amounts and were structured as monthly consulting payments).

Moreover, the conspirators sought to conceal the true nature of the payments. *See, e.g., United States v. Dial*, 757 F.2d 163, 170 (7th Cir. 1985) ("The defendants' elaborate efforts at concealment provide powerful evidence of their own consciousness of wrongdoing . . . ."); *accord Bruno,* 661 F.3d at 744 (attempt to cover up payments is proof of *quid pro quo*). The conspirators used a nominee third-party as a pass-through entity for the payments and ensured Individual FR-1 did not publicly register as a lobbyist. The AT&T conspirators further supplied false internal justifications for the retention of Individual FR-1. R. 1, Count 1, ¶¶ 6-7.

In addition, the fact that McClain—Madigan's agent who was not engaged by AT&T and was no longer a registered lobbyist—approved the amount of money paid to Individual FR-1 demonstrates that the hire was intended to ensure that Madigan did not impede AT&T's COLR legislation, rather than the result of a legitimate business decision by AT&T. Indeed, Individual FR-1 did not do any work for AT&T during the nine months he was paid by the company. R. 1, Count 1, ¶¶ 11-12. The indictment sufficiently alleges that payments to Individual FR-1 were intended to

bribe Madigan, so that he would take favorable action on a specific piece of legislation pending before the General Assembly.

The indictment also clearly spells out specific official action taken by Madigan. On May 26, 2017, just weeks after defendant and AT&T engaged Individual FR-1, Madigan directed a roll call on AT&T's COLR legislation. R. 1, Count 1, ¶ 17(o). He then voted in favor of the bill on three subsequent occasions (May 31, June 29, and July 1, 2017). *Id.* ¶¶ 17(p)-(r). These were plainly official acts. *United States v. Woodward*, 905 F.3d 40, 45 (1st Cir. 2018) ("An official act means any decision or action in the enactment of legislation"); *see also United States v. Urciuoli*, 613 F.3d 11, 13, 18 (1st Cir. 2010) (affirming bribery conviction where hospital executive paid a state senator to use his official position to "support or oppose bills in accordance with [the hospital's] interest, including attempts to 'kill' certain bills").

In any event, a bribery indictment does not need to allege that the bribe *succeeded* or that the public official actually took the promised official action. *McDonnell v. United States*, 579 U.S. 550, 572 (2016). The indictment need only allege, as it does here, that a public official intended to accept benefits, knowing they were given in exchange for official action. *See id.*; *see also United States v. Kimbrew*, 944 F.3d 810, 815-16 (9th Cir. 2019) ("In short, execution is immaterial" with bribery charges). Further, a "[*quid pro quo*] agreement need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain." *McDonnell*, 579 U.S. at 572; *see also Snyder*, 144 S. Ct. at 1959 (no defense to § 666 charges for a public official to argue "he would have taken the same act anyway and

15

therefore was not 'influenced' by the payment"). The key is "that there be a nexus between the public official's position and the *quo* he promises"—not his ultimate delivery of an official act. *Kimbrew*, 944 F.3d at 816.

Judge Dow rejected similar arguments advanced by former Alderman Ed Burke in challenging § 666 charges. *United States v. Burke*, No. 19 CR 322, 2022 WL 1970189, at *16 (N.D. Ill. June 6, 2022). There, Judge Dow found "ample allegations from which a *quid pro quo* may be inferred" given that the indictment put "Ald. Burke on notice of the *quid*, the players, and the *quo*." *Id.*; *see also United States v. Blagojevich*, 894 F.3d 729, 738 (7th Cir. 2015) (*quid pro quo* need not be and indeed usually is not demanded explicitly and can be inferred based on other evidence); *United States v. Benjamin*, 95 F.4th 60, 68 (2d Cir. 2024) (collecting cases holding the same from every other circuit to have considered the question). Here too, the indictment sufficiently alleges that defendant intended to bribe Madigan in exchange for official action related to the COLR legislation.

## D. Defendant's Definition of "*Quid Pro Quo*" Is Incorrect.

Defendant incorrectly contends that § 666 requires an agreement between Madigan and himself. Section 666 does not require a meeting of the minds between the bribe payor or bribe payee; at trial, the government is only required prove that defendant intended to engage in a *quid pro quo*. *See United States v. Jennings*, 160 F.3d 1006, 1017 (4th Cir. 1998) ("Under § 666(a)(2) the intent of the payor, not the intent of the payee, is determinative of whether a crime occurred." (collecting cases)); *United States v. Suhl*, 885 F.3d 1106, 1112 (8th Cir. 2018) (finding that neither § 666,

§ 201, "nor *McDonnell*, imposes a universal requirement that bribe payors and payees have a meeting of the minds about an official act.").

The structure of § 666 confirms this reading. As an initial matter, § 666 has two separate bribery provisions: § 666(a)(1)(B), which prohibits agents (like Madigan) from corruptly soliciting and demanding things of value, and § 666(a)(2), which independently prohibits bribe payers from offering or giving this of value to agents like Madigan. This means, in plain terms, that these crimes may be completed either by a corrupt solicitation or offer, regardless of whether an agreement is reached. For example, a police officer who asks for $100 from a motorist in return for not writing a speeding ticket has solicited a bribe; the motorist does not have to agree to pay the money for a crime to be committed. Similarly, an individual who offers a bribe to a public official in hopes of influencing their vote violates § 666(a)(2) whether or not the official agrees to take the bribe. Moreover, § 666(a)(2) prohibits not just agreements to give something of value, but corrupt offers as well.[2] 18 U.S.C. § 666(a)(2). By including the phrase "or" in the statute's text, Congress made clear that an agreement is *not* required under § 666. *See New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 61 (1980). In other words, proof of intent to exchange a benefit for an official action does not require proof of an agreement.

---

[2] Likewise, in the context of honest services fraud, no meeting of the minds between both parties or a completed exchange is necessary to establish a *quid pro quo*. *See, e.g., United States v. Ring*, 706 F.3d 460, 467-68 (D.C. Cir. 2013) (no completed corrupt exchange or agreement needed for honest services fraud; the statute punishes the scheme, not its success); *United States v. Avenatti*, 432 F. Supp. 3d 354, 365 (S.D.N.Y. 2020).

Indeed, as noted above, the Supreme Court in *Snyder* held that § 666 shares the defining characteristics of a bribery provision: a corrupt state of mind when making an offer or solicitation and "the intent to be influenced" or the intent to influence as to an official act. *Snyder*, 144 S. Ct. at 1955. That is all that is required; not proof of a Latin phrase of indeterminate meaning that is not mentioned at all in the *Snyder* opinion. Based on the plain statutory text and the cases described above, the government need not prove an agreement between Madigan and defendant for § 666. Instead, it is defendant's intent as the bribe payor that is the focus.

### E.     Defendant's Definition of "Corruptly" Is Incorrect.

Relying primarily upon *Snyder*, defendant incorrectly argues that "corrupt" intent requires the government to prove that he knew his acts to be unlawful. From the outset, defendant misconstrues *Snyder*, which did not address the meaning of "corruptly" in § 666 at all. Rather, *Snyder* underscored that the sole issue in that case was whether § 666 prohibits gratuities as well as bribes, not the question of intent. *See* 144 S. Ct. at 1951 ("The question in this case is whether § 666 also makes it a crime for state and local officials to accept *gratuities* . . . ."); *id.* at 1955 ("The question in this case is whether 18 U.S.C. § 666(a)(1)(B) makes it a federal crime for state and local officials to accept gratuities for their past official acts."); *see also id.* at 1969 (Jackson, J., dissenting) (recognizing that "the precise meaning of the term 'corruptly' is not the question before us today").

Unsurprisingly, therefore, *Snyder* references the words "corrupt" or "corruptly" only a handful of times. When it does, it makes no attempt to establish the precise meaning of those terms, either in general or as used in § 666. Instead, it merely uses

them to distinguish bribes from gratuities. *See id.* at 1951 ("American law generally treats bribes as inherently corrupt and unlawful. But the law's treatment of gratuities is more nuanced."); *id.* ("After all, unlike gratuities, bribes can corrupt the official act . . . ."); *id.* at 1955 (noting that both 18 U.S.C. § 201(b) and § 666 share "the defining characteristics" of a "corrupt state of mind and the intent to be influenced in the official act," thereby "strongly suggest[ing] that § 666—like § 201(b)—is a bribery statute, not a gratuities statute"); *id.* at 1959 (same).

Thus, contrary to defendant's belief, *Snyder* did not imply that "corruptly" must be interpreted "narrowly," nor did it endorse his claim that it equates to knowledge of illegality. *See* R. 63 at 2-8, R. 66 at 3 & n. 1. If anything, the "majority suggests that 'corruptly' just means *quid pro quo*," 144 S. Ct. at 1969 (Jackson, J., dissenting); *see also id.* at 1955, that is, "a specific intent to give or receive something of value *in exchange* for an official act." *United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404-05 (1999). The Supreme Court's interpretation remains entirely consistent with the Seventh Circuit's existing pattern instruction, which states that a "person acts corruptly when that person acts with the intent that something of value is given or offered to reward or influence an agent of an [organization; government; government agency] in connection with the agent's [organizational; official] duties." 7th Cir. Pattern Crim. Jury Instr. at 304 (2023). What is more, binding precedent has previously affirmed the sufficiency of that definition. *See United States v. Hawkins*, 777 F.3d 880, 882 (7th Cir. 2015); *United States v. Mullins*, 800 F.3d 866, 870 (7th Cir. 2015).

Even though *Snyder* left this circuit's binding precedent concerning the reading of "corruptly" undisturbed, the government will nonetheless agree to a more conservative, defense-friendly, instruction that requires the jury to find that defendant understood his conduct to be wrongful or unlawful. R. 61 at 7. That interpretation comports with Supreme Court precedent that, unlike *Snyder*, took the "natural meaning" of "corruptly" head on. *See Arthur Andersen LLP v. United States*, 544 U.S. 696, 705 (2005). In *Arthur Andersen*, the Court unanimously found that the terms "'[c]orrupt' and 'corruptly' are normally associated with wrongful, immoral, depraved, or evil[,]" which in turn the Court equated with "consciousness of wrongdoing." *Id.* at 705-06. Critically, the Court omitted an added awareness of illegality. *See id.* at 705-06.

Defendant's filings further ignore the litany of cases both in and outside the Seventh Circuit that, in the wake of *Arthur Anderson*, have applied similar definitions of "corruptly" to other criminal statutes. *See, e.g., United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014) (defining "corruptly" under § 1512(c)(2) as acting "with a wrongful purpose"); *United States v. Matthews*, 505 F.3d 698, 705-07 (7th Cir. 2007) (approving jury instruction defining "corruptly" under § 1512(c)(1) "as acting 'with the purpose of wrongfully impeding the due administration of justice'" (quoting 7th Cir. Pattern Crim. Jury Instr. for 18 U.S.C. § 1503 (1999))); *United States v. Robertson*, 103 F.4th 1, 15 (D.C. Cir. 2023) (noting that "courts that have construed 'corruptly' in 18 U.S.C. § 1512 and in similar obstruction statutes have often focused on equating 'corruption' with 'wrongfulness.'"); *United States v. Lonich*, 23 F.4th 881,

902 (9th Cir. 2022) ("'As used in criminal-law' statutes, the term 'corruptly' usually 'indicates a wrongful desire for pecuniary gain or other advantage.'" (quoting *Black's Law Dictionary* 435 (11th ed. 2019))); *United States v. Farrell*, 921 F.3d 116, 141 (4th Cir. 2019) ("To act 'corruptly' [under § 1512(c)(2)] means to act wrongfully."); *United States v. Ng Lap Seng*, 934 F.3d 110, 142 (2d Cir. 2019) ("When a statute uses the word 'corruptly,' the government must prove . . . that a defendant acted 'with the bad purpose of accomplishing either an unlawful end or result, or a lawful end or result by some unlawful method or means.'" (quoting *United States v. McElroy*, 910 F.2d 1016, 1021-22 (2d Cir. 1990))); *United States v. Mann*, 701 F.3d 274, 307 (8th Cir. 2012) (upholding convictions under § 1512(c)(1), (c)(2), and (k) where "the jury was instructed that 'corruptly' means to act with 'consciousness of wrongdoing'"). The weight of this authority dwarfs that offered by defense.

Defendant now asks this Court to do what *Snyder*, *Arthur Anderson*, and the above cases all did not do, to ignore binding Circuit precedent, and superimpose a willfulness standard onto a bribery statute requiring corrupt intent. In doing so, he fails to cite any court that has adopted his position. Indeed, besides *Snyder* (which, as discussed above, does not address the meaning of "corruptly"), he otherwise mentions only a single out-of-circuit concurrence where the judgment was subsequently vacated. *See* R. 63 at 6 (discussing *United States v. Fischer*, 64 F.4th 329, 353-56 (D.C. Cir. 2023) (Walker, J., concurring), *vacated and remanded*, 144 S. Ct. 2176 (2024)). He also overlooks the Seventh Circuit's decision in *United States v. Blagojevich*, which affirmed that a mistake of law defense was not available in a

21

prosecution involving § 666, and pointed out such defenses are only associated with certain statutes that have the word "willfully" in them. 794 F.3d at 738-39.

Adopting defendant's view would distort the "natural meaning" of "corruptly" set forth in *Arthur Anderson* and contravene the Court's restrained approach in *Snyder*. The *Snyder* majority was undoubtedly aware of the *Arthur Anderson* definition, which was cited in both the government's pleadings and Justice Jackson's dissenting opinion. Moreover, as defendant is quick to highlight, the issue of *mens rea* was an express topic of discussion during oral argument. Despite this, any fair reading of *Snyder* makes clear that although the Court was willing to narrow the *actus rei* prohibited under § 666, it was disinclined to heighten the associated *mens rea*, and certainly not to the degree that defendant proposes here. Had the Court desired a different result, *Snyder* presented the perfect opportunity. The Court's deliberate silence on that issue is therefore telling. It also places the Court's questions—and the government's responses—about the meaning of "corruptly" during oral argument in proper perspective. Reviewing that inquiry through the lens of the *Snyder* opinion reveals that the Court was probing whether that term could adequately filter out "innocuous" gratuities from criminal liability. *Snyder* tells us that the Court decided that it could not, and instead concluded that "corruptly" was merely a signal that the statute only applies to those who intended to engage in bribery. The Court's ruminations during oral argument, however, are a far cry from

22

defendant's proffered explanation, which unduly seeks to impute positions to the Court that are conspicuously absent in its actual written opinion.[3]

Defendant's position also flies in the face of congressional intent. A variety of federal criminal statutes—most commonly involving bribery, obstruction of justice, and witness tampering—include the term "corruptly." *See, e.g.*, 18 U.S.C. § 201 (bribery of public officials and witnesses); *id.* § 226 (bribery affecting port security); *id.* § 666 (theft or bribery concerning programs receiving federal funds); *id.* § 1505 (obstruction of proceedings before departments, agencies, and committees); *id.* § 1512(b)-(c) (obstructing official proceedings); *id.* § 1517 (obstructing examination of a financial institution). Conversely, a multitude of others use the term "willfully." *See, e.g.,* 18 U.S.C. § 245(b) (interference with federally protected activities), *id.* § 1001(a) (false statement to a department or agency of the United States), *id.* § 1035(a) (false statements relating to health care matters); 26 U.S.C. § 7206(1)-(2) (fraud or false statements in federal tax returns); 42 U.S.C. § 1320a-7b(a) (offering or paying a health care kickback). Had Congress intended § 666 to require knowledge of unlawfulness, it would have included a willfulness requirement in the statute. The fact that it did not further counsels against defendant's interpretation.

Defendant's other arguments are all unpersuasive. He cherry-picks, for example, an excerpt from *Snyder* where the Court opined that asking state and local

---

[3] Contrary to the defendant's suggestion, after the *Snyder* decision, the Solicitor General formally adopted the same view as expressed in this brief concerning the meaning of the term 'corruptly.'" *See Stephen M. Calk, Aka Sealed Defendant 1, Petitioner, v. United States of America*, Resp't Br., 2024 WL 3550159, at *17-19 (Jul. 24, 2024).

officials to differentiate between "wrongful" and "obviously benign" gratuities "is no guidance at all." 144 S. Ct. at 1957. This language, he claims, implicitly rejects using a wrongfulness standard for bribes as well. That argument falls flat considering the Court's lengthy preceding discussion distinguishing bribes from gratuities. *See id.* at 1951-53. The Court was concerned with "fair notice" in the gratuity context because it recognized that while "[s]ome gratuities can be problematic . . . [o]thers are commonplace and might be innocuous." *Id.* at 1952-53, 1957. It also acknowledged, however, that "gratuities after [an] official act are not the same as bribes before the official act." *Id.* at 1952. According to the Court, "unlike gratuities, bribes can corrupt the official act—meaning that [an] official takes the act for private gain, not for the public good." *Id.* As a result, while treatment of gratuities "is more nuanced," "American law generally treats bribes as *inherently* corrupt and unlawful." *Id.* at 1951 (emphasis added). In other words, there is not, and the Court did not suggest, a class of problematic bribes on the one hand, and a class of commonplace or innocuous bribes, on the other. All bribes are unlawful. Thus, bribes risk none of the "traps for unwary state and local officials" purportedly posed by gratuities. *Id.* at 1957. Properly read in this context, *Snyder*'s fair notice discussion has no application to the bribery charges in this case.

Defendant's "rule of lenity" arguments fail for the same reasons. Justice Gorsuch's concurrence, which attracted no other Justice of the Court, applied that doctrine to the issue of whether § 666 proscribed both bribes and gratuities, not to the question of intent. Now that *Snyder* has addressed that ambiguity, further

deference is unnecessary. The *Snyder* majority made clear that it abolished what it deemed a "vague and unfair trap" regarding gratuities in favor of what it is now a "vital," "targeted" statute against bribes. 144 S. Ct. at 1959-60. Defendant now seeks a further interpretive windfall that would eviscerate the statute entirely. Such a course would betray the well-established principle that lenity "applies only when a criminal statute contains 'grievous ambiguity or uncertainty,' and 'only if, after seizing everything from which aid can be derived,' the Court 'can make no more than a guess as to what Congress intended.'" *United States v. Chaoqun*, No. 23-1262, 2024 WL 3355141, at *10 (7th Cir. July 10, 2024) (quoting *Ocasio*, 578 U.S. at 295 n. 8 (2016)). A court should not apply the rule of lenity "to override a sensible principle . . . buttressed by a criminal statute's text and structure." *United States v. Abreu*, 106 F.4th 1 (1st Cir. 2024) (quoting *Lockhart v. United States*, 577 U.S. 347, 361 (2016)).

Equally misplaced is defendant's fear that a wrongfulness standard would somehow inject "intolerable uncertainty" by enabling "jurors to subjectively insert their own moral views and standards as to right and wrong." R. 63 at 5. As the Court's instructions will explain, *mens rea* deals with the mind of the accused, not the trier of fact. Thus, the jury will decide whether defendant knew his acts were wrongful at the time he committed them, not whether jurors personally deem them immoral at the time of deliberations. Once again, defendant's argument is a straw man.

Finally, defendant's First Amendment concerns do not warrant the remedy he seeks. He claims that defining "corruptly" to include knowledge of wrongfulness risks

"chilling protected activities around lobbying the government." R. 63 at 8. That argument ignores the "inherently corrupt and unlawful" nature of bribes. *Snyder*, 144 S. Ct. at 1951. This intrinsic wrongfulness would be particularly evident to an experienced, sophisticated corporate executive charged with managing his company's legislative affairs department. To suggest that defendant and others like him would not be familiar with the concept of bribery is absurd.

Furthermore, the Court balanced equally important constitutional and policy considerations in *Arthur Andersen*. There, the Court recognized that innocuous conduct that could have potentially fallen within the scope of the obstruction statute in that case involved the right against compelled self-incrimination as well as attorney-client and marital privilege. *See* 544 U.S. at 704. Nonetheless, the Court still held that "limiting criminality to [those] conscious of their wrongdoing sensibly allow[ed] [the statute] to reach only those with the level of 'culpability . . . we usually require in order to impose criminal liability.'" *Id.* 706 (quoting *United States v. Aguilar*, 515 U.S. 593, 616 (1995)).

Given the weakness of defendant's claims, it is no surprise that post-*Snyder*, one court in this district has already rejected similar arguments and adopted the same "corruptly" formulation that the government offers here. *United States v. Mitziga,* No. 23 CR 242 (N.D. Ill.) (Kennelly, J.). That instruction does not require the government to prove knowledge of illegality. Instead, the court told the jury in its preliminary instructions at the outset of the case that "[a] person acts corruptly when he gives, offers, or agrees to give something of value to a public official for the purpose

of influencing the official in the performance of an official act, understanding that doing so is wrongful or unlawful." The court will presumably give the same instruction after the close of evidence. For the reasons set forth above, this Court should do the same.

## II. Defendant's Motion for Production of Grand Jury Minutes Should Be Denied.

### A. Applicable Law

The Supreme Court has consistently "recognized that the proper functioning of our grand jury system depends on the secrecy of grand jury proceedings" and in "the absence of a clear indication in a statute or [r]ule, [the court] must always be reluctant to conclude that a breach of secrecy has been authorized." *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 424-25 (1983) (citations omitted). Rule 6(e) of the Federal Rules of Criminal Procedure codifies the centuries-old requirement that grand jury proceedings generally be kept secret. *See Matter of Grand Jury Proc., Special Sept., 1986*, 942 F.2d 1195, 1198 (7th Cir. 1991). As relevant to this case, Rule 6(e)(3)(E)(ii) provides that the court may authorize disclosure of a grand jury matter "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Cr. P. 6(e)(3)(E)(ii).

A party requesting grand jury material under this provision bears the burden of a "strong showing of particularized need" for grand jury materials. *See Sells Engineering*, 463 U.S. at 442-43. Disclosure is only appropriate when that particularized need outweighs the public interest in grand jury secrecy. *Id.* at 443. As

the Seventh Circuit has stated, "the standard for determining when the traditional secrecy of the grand jury may be broken is deliberately stringent: parties seeking disclosure of grand jury transcripts must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed." *Matter of Grand Jury Proc.*, 942 F.2d at 1198 (citing *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 222 (1979)). A party seeking disclosure of grand jury proceedings "must demonstrate more than relevance; he must show necessity to prevent injustice." *Hernly v. United States*, 832 F.2d 980, 983 (7th Cir. 1987) (citing *United States v. Proctor & Gamble*, 356 U.S. 677, 682 (1958)).

Significantly, there is a presumption of regularity in grand jury proceedings. *United States v. Lisinski*, 728 F.2d 887, 893 (7th Cir. 1984). "Mere unsupported speculation of possible prosecutorial abuse does not meet the particularized need standard." *United States v. Canino*, 949 F.2d 928, 943 (7th Cir. 1991).

**B.    Defendant Cannot Show Particularized Need for Grand Jury Materials Based on the Government's Instructions Relating to Bribery.**[4]

██████████████████████████████████████████████  ████████
██████████████████████████████████████████████████████████

---

[4] Because sections II.B and II.C of the government's brief concern matters occurring before the grand jury, the government has redacted the public version of those sections and will submit grand jury materials to the Court *in camera*.



███████████████████████████████████████████

████████████████████████████████ [5]

### C. Defendant Cannot Show Particularized Need for Grand Jury Materials Based on the Government's Instructions Relating to the Term "Corruptly."

████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████ ████ ████████████

████████████████████ █████ █████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

---

[5] Even setting the merits of defendant's motion aside, as a procedural matter, a request to compel production of grand jury minutes to third parties should be presented to the Chief Judge of this district. Local Criminal Rule 6.1 mandates that "[a]ll matters pertaining to grand juries shall be heard by the chief judge or his or her designee."





## CONCLUSION

For foregoing reasons, the government respectfully requests that the Court deny defendant's pretrial motions.

Respectfully submitted.

MORRIS PASQUAL
Acting United States Attorney

By:     /s/ *Paul Mower*
AMARJEET S. BHACHU
JULIA K. SCHWARTZ
TIMOTHY J. CHAPMAN
PAUL MOWER
SUSHMA RAJU
Assistant United States Attorneys
219 South Dearborn Street
Fifth Floor
Chicago, Illinois 60604
(312) 353-5300